## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | | |
|---|---|---|
| GLORIA J. ALLEN, as next friend of J.D.L., JR., M.A.M., and Z.G.L., minor children of the decedent, Jeremy D. Love, Sr., and GLORIA J. ALLEN, as Administratrix of the Estate of Jeremy D. Love, Sr., | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | |
| Plaintiff, | * <br> * | |
| v. | * <br> * | CV 110-022 |
| MIKE FREEMAN, Sergeant, individually and in his official capacity as an officer with the Grovetown Police Department, and CHESTER HOPKINS, Officer, individually and in his official capacity as an officer with the Grovetown Police Department, | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | |
| Defendants. | * | |

---

## O R D E R

---

Presently pending before the Court is Defendants' motion for summary judgment. (Doc. no. 36.) Upon due consideration, this motion is hereby **DENIED**.


## I. BACKGROUND

### A. Factual Background

This case arises from the suicide of Jeremy D. Love, Sr., ("Love") while Love was detained at the City of Grovetown Detention Center (the "Jail").

### 1. *Love's Arrest and Jail Intake*

On April 28, 2008, Love got into an argument with his mother, Plaintiff Gloria J. Allen, at their shared residence in Grovetown, Georgia. (Allen Dep. at 10, 41.) Plaintiff Allen called the Grovetown Department of Public Safety ("GDPS") because Love was cussing at her and "kept getting in [her] face." (Id. at 42.) At approximately 4:45 p.m., GDPS Officer Brown and GDPS Sergeant Harden arrived at the scene and subsequently arrested Love for disorderly conduct. (Id. at 42-44; Doc. no. 42 at 9, 12.)

Around 5:30 p.m., Love was brought into the Jail and placed in the custody of Defendant Michael Freeman ("Freeman"), a GDPS Sergeant, and Defendant Chester Hopkins ("Hopkins"), a GDPS Officer.[1] (Doc. no. 42 at 20, 36, 40.) When Love came in, Hopkins observed that Love was "very agitated and upset" and "looked strung out." (Hopkins Dep. at 15-16.) Freeman also noticed that Love was "extremely agitated and upset." (Freeman Dep. at 60-61.)

As part of Love's intake, Hopkins filled out an intake form with the assistance of Freeman. (Doc. no. 42 at 14-15; Hopkins

---

[1] Hopkins joined GDPS on March 26, 2008, approximately one month before Love's suicide. (Doc. no. 43 at 4.) He was initially assigned to dispatch and was reassigned to the Jail a few days before Love's suicide. (Freeman Dep. at 8-9; Hopkins Dep. at 8-10.)

Freeman had been with GDPS since 1995 and was responsible for supervising and training Hopkins. (Doc. no. 43 at 46; Hopkins Dep. at 12, 23-24; Freeman Dep. at 8-9, 20.) Love had been housed in the Jail a few times in the past, but Freeman was unaware of any past suicidal behavior by Love during those prior stints. (Allen Dep. at 35; Freeman Dep. at 32; Doc. no. 42 at 38.)

Dep. at 18, 20; Freeman Dep. at 10, 13.)   On the intake form, Hopkins indicated that Love appeared to be under the influence of alcohol.[2]   (Doc. no. 42 at 14.)   Hopkins also indicated that Love was currently taking medication for a psychiatric disorder.[3] (Id.)

The ninth question on the intake form asks: "Does the inmate's behavior suggest the risk of suicide?"   (Doc. no. 42 at 14.)   To address this question, Hopkins or Freeman apparently asked Love if he had any suicidal thoughts or intentions.   (See id. at 36.)   According to Hopkins, Love then said: "I don't want to be here anymore" and also said or mumbled "something about a pine box."[4]   (Hopkins Dep. at 21; see also Doc. no. 42 at 40.)

After Love made these two remarks, Hopkins initially checked the "Yes" box adjacent to the ninth question - thus, indicating he believed Love was a suicide risk.   (Hopkins Dep. at 19-21; Doc. no. 42 at 40.)   After Hopkins checked "Yes," Love looked at the intake form, read the ninth question twice, and said, "no, that's not what I meant."   (Hopkins Dep. at 20.)

---

[2] The fact that Love had been drinking may have been relayed to Hopkins by Sergeant Harden, who made the arrest.   (Hopkins Dep. at 18.)   Despite the fact that Love "looked strung out," Hopkins indicated on the intake form that Love did not appear to be under the influence of other drugs or have any symptoms of alcohol or drug withdrawal.   (See Doc. no. 42 at 14; Hopkins Dep. at 15-16.)

[3] The "Arrest/Booking Report," a different form, indicated that Love was "under doctor's care and/or taking any medications" and listed "High Stress Disorder" on the corresponding line.   (Doc. no. 42 at 9.)   The arrest and booking report was not signed by the "receiving official," (id.), but may have been filled out by Freeman.   (See Freeman Dep. at 13.)   At his deposition, Freeman did not remember anything about Love's "high stress disorder."   (See Freeman Dep. at 13, 15, 17-18).

[4] The term "pine box" generally denotes a coffin.   (Eiser Dep. at 46.)

Hopkins then let Love read the question one more time and asked Love if he was sure that's not what he meant, and Love said, "that's not what I meant; I just don't want to be here."   (Id.) At that point, Hopkins crossed out the check next to "Yes," put his initials by it, and checked "No."[5]   (Id.)

Somewhat similarly, Freeman recounted, "[Love] said that he didn't want to be there" and "mumbled something about a pine box."   (Freeman Dep. at 11; see also Doc. no. 42 at 36.) According to Freeman, he then asked Love, "are you saying you're going to hurt yourself or you want to hurt yourself?"   (Freeman Dep. at 11.)   Love responded, "no, I just don't want to be here."   (Id.)   Freeman asked again, "do you want to hurt yourself?" and also said, "if you do, I'll call EMS right now." (Id.)   Love responded that he was not going to hurt himself, and Hopkins changed the intake form from "Yes" to "No."   (Id. at 12; Doc. no. 42 at 36.)   As a result, Love was not formally placed on suicide watch.[6]   (See Doc. no. 42 at 15.)

After the intake paperwork was completed at approximately 6:00 p.m., GDPS Officer Meek ("Meek") relieved Freeman and Hopkins for the night shift.   (Doc. no. 42 at 20, 40; Hopkins Dep. at 41.)   Freeman told Meek to check on Love because Love

---

[5] As currently shown in the record, the intake form reflects Hopkins's testimony, except that the check mark next to "No" has been scribbled out. (See Doc. no. 42 at 14.)

[6] If Love had been placed on suicide watch, he would have been placed in a cell away from other inmates; checked on every ten or fifteen minutes; his mattress and sheets would have been taken away; and medical professionals would have been contacted to evaluate him.   (Freeman Dep. at 10, 16, 53, 64; see also Doc. no. 40 at 32, 34, & Ex. 1 at 21, 44.)

was "extremely agitated" and "could do anything back there."
(Freeman Dep. at 60-61.)

### 2. The Jail Cell

Love was placed in Cell Block A, the men's holding cell,
with three other inmates.  (Doc. no. 42 at 25-32.)  The cell
contains four sets of bunk beds along the east wall.  (See Doc.
no. 43 at 2; Doc. no. 39 at 3.)  Along the south wall, there was
a toilet and a shower stall with a wooden door.  (See Doc. nos.
39 at 3, 5; 42 at 25, 28-29; Hopkins Dep. at 30.)  The frame of
the shower door was six feet, ten inches in height and about
four feet wide.  (Doc. no. 42 at 29.)  An aluminum support bar
ran along the top of the shower door frame.  (Id. at 25, 29.)
The shower door support bar was strong enough to hold Love, who
weighed 145 pounds and was five feet, eight inches in height.
(Doc. no. 42 at 63, 66.)  The shower door and its support bar
have since been removed.  (See Doc. no. 39 at 3; Freeman Dep. at
34-37.)

The GDPS dispatch room is located on the other side of the
north wall of Cell Block A.  (Freeman Dep. at 43.)  There are
three windows on the north wall, which could permit dispatchers
to observe the cell, including the shower stall.  (See id. at
43-46, 49-50; Doc. nos. 39 at 7; 43 at 2.)  However, the windows
had been covered up with cardboard or plywood for over ten
years.  (Freeman Dep. at 45-46, 49-50; Robinson Dep. at 14.)

### 3. Events Leading Up to the Suicide

During the night shift, Meek checked on the inmates about once per hour but did not note anything unusual.[7]  (See Doc. no. 42 at 20-21.)  On the next day, April 29, 2008, Freeman arrived at the Jail at 5:40 a.m. and relieved Meek.  (Id. at 21; Freeman Dep. at 28.)  Hopkins arrived at 7:30 a.m. and fed the inmates breakfast.[8]  (Hopkins Dep. at 42.)  At 10:00 a.m., a probation officer spoke with the inmates, including Love individually, about probation violations.  (Id. at 43; Doc. no. 42 at 22.)  At 11:15 a.m., Freeman spoke with a judge, who informed him that Love would not receive a 48-hour hearing because of a probation hold.  (Freeman Dep. at 26-27.)  Freeman relayed this information to Love.  (Id. at 27.)

At some point prior to lunch, Hopkins inspected Cell Block A and observed that Love was by the shower stall and was tying or had tied a bed sheet around the shower door support bar.[9]  (Doc. no. 42 at 36, 41.)  Hopkins didn't say anything to Love,

---

[7] The three other inmates all observed Love make statements and take certain actions which strongly suggested that Love was suicidal.  (See Doc. no. 42 at 32, 34, 57.)  However, none of the inmates reported what they saw and heard to the Jail staff.  (Id.)

[8] Love did not eat breakfast.  (Hopkins Dep. at 48.)

[9] During an interview performed by Special Agent Steven W. Foster of the Georgia Bureau of Investigation ("GBI"), Hopkins stated that Love had "tied" the bed sheet around the shower door support bar.  (Doc. no. 42 at 41.)  Contradicting his earlier statement, Hopkins stated during his deposition: "It didn't appear to be tied to me."  (Hopkins Dep. at 45.)  Hopkins said: "It just looked like he was hanging a dry towel up.  Like he had threw [sic] it over there and the sheet was hanging perfectly down like he wanted his own makeshift shower curtain."  (Id. at 44-45.)  Viewing the facts in the light most favorable to Plaintiff, the Court assumes Hopkins saw that Love had tied – not merely draped – the sheet on the shower door support bar.

but reported what he saw to Freeman.[10]    (Id. at 41; Hopkins Dep.
at 44.)    Freeman told Hopkins to tell Love to take down the
sheet.    (Freeman Dep. at 30; Hopkins Dep. at 44-45.)    Hopkins
went back to the cell, but Love had already taken the sheet down
and was back in his bunk, apparently sleeping.[11]    (Hopkins Dep.
at 44, 46.)    No further action was taken.    (Id.)    The sheet-
tying incident was not recorded in the jail log.    (See Doc. no.
42 at 22; Freeman Dep. at 29.)

   At 12:20 p.m., Hopkins fed the inmates.    (Hopkins Dep. at
48.)    When he picked up the trays, he saw that Love did not eat

---

[10] At Hopkins's deposition, Hopkins said he told Freeman that Love had
"thrown" the sheet on the support bar.    (Hopkins Dep. at 46.)    And at one
point during Freeman's deposition, Freeman recalled that the sheet was merely
"tucked under a mattress" on the bunk bed.    (Freeman Dep. at 38.)    However,
during Freeman's GBI interview and at other times in his deposition, Freeman
recalled that Hopkins had informed him that Love was "tying" the sheet "to
the bar."    (Id. at 29; Doc. no. 42 at 36.)    The Court resolves this
inconsistency in favor of Plaintiff and assumes Freeman knew the sheet had
been "tied" down.

   Freeman stated that he thought Hopkins was referring only to the bar on
Love's bunk, as opposed to the shower door support bar.    (Freeman Dep. at 29-
30; Doc. no. 42 at 37.)    Freeman apparently thought that Love was merely
trying to make a privacy tent on the bunk bed.    (Freeman Dep. at 29-30; Doc.
no. 42 at 37.)    He even recalls being told by Hopkins that Love was "making a
tent," which would not have been out of the ordinary.    (Freeman Dep. at 29,
31-32.)    However, Freeman could not recall Hopkins saying that the sheet had
been tied to the bunk.    (Id. at 38, 66.)    More importantly, there is evidence
that Freeman was told the sheet was tied to the shower door support bar.
During Hopkins's GBI interview, "Hopkins related that at one time in the
morning, prior to lunch, he observed that Love had tied a bed sheet around
the shower door support bar.    [Hopkins] advised that he informed Sergeant
Freeman about this and was told to have Love remove the sheet."    (Doc. no. 42
at 41 (emphasis added).)    Additionally, Freeman acknowledged that he was
aware that inmates could commit suicide by tying a sheet to either the shower
door support bar or the bunk beds, and he would have considered it out of the
ordinary if a sheet was tied down to either location.    (See Freeman Dep. at
32, 37-38, 72.)

[11] According to Hopkins, it took under a minute to report the incident
to Freeman and return to the cell.    (Hopkins Dep. at 44, 46.)

lunch.[12]   (Id.)   This was the last time that Hopkins observed Love before the suicide.   (Id.)

### 4. The Suicide

At approximately 1:25 p.m., Freeman heard a banging noise coming from Cell Block A and found two inmates beating on the door.   (Doc. no. 42 at 37.)   One inmate told Freeman that Love had hanged himself in the shower stall.   (Id.)   Freeman called for assistance, entered the cell, and found Love hanging with a bed sheet tied from the shower door support bar to his neck. (Id.)   Several other officers, firefighters, and paramedics arrived.   (Id. at 41, 51.)   GDPS Investigator Brandon Thacker lifted Love up while the sheet was cut, and then lowered Love to the ground.   (Id. at 41.)   Love was warm to the touch, but was not breathing and had no pulse.   (Id. at 37.)   The officers and firefighters performed CPR and utilized an electronic defibrillator in an unsuccessful attempt to revive Love.   (Id. at 41.)   He was transported to a hospital and pronounced dead upon arrival.[13]   (Id. at 38.)

### B. Procedural History

On February 17, 2010, Plaintiff Gloria J. Allen, on behalf of her grandchildren and as administratix of Love's estate,

---

[12] Hopkins told Freeman that Love had not eaten breakfast or lunch. (Id.)

[13] An autopsy report confirmed that the cause of death was hanging and the manner of death was suicide. (Doc. no. 42 at 66.) A toxicology report revealed the presence of cocaine, marijuana, alprazolam (Xanax), and lorazepam in Love's body at the time of his death. (Doc. no. 42 at 2, 69.)

filed the Complaint which asserts various federal and state claims against Freeman, Hopkins, the City of Grovetown ("Grovetown"), Director/Chief Al Robinson ("Robinson"), and Sergeant Christopher Harden ("Harden"). (Doc. no. 1.) On April 2, 2010, Defendants moved for partial judgment on the pleadings as to Grovetown, Robinson, and Harden.[14] (Doc. no. 13.) On December 20, 2010, the Court granted this motion and dismissed all the claims against Grovetown, Robinson, and Harden. (Doc. no. 21.) On December 30, 2010, Plaintiff filed a motion for reconsideration. (Doc. no. 23.) On March 21, 2011, Plaintiff filed a motion to amend the Complaint, which also called for the Court to reconsider its December 20, 2010 Order. (Doc. no. 27.)

Plaintiff's motion for reconsideration and motion to amend were still pending when, on May 3, 2011, the Court granted the parties' consent motion to stay the case pending alternative dispute resolution. (Doc. no. 29.) In that Order, the Court closed the case for statistical purposes and set October 28, 2011, as the deadline for the parties to file a notice of settlement or a motion to reopen. The Court also stated: "Should a motion to reopen be required, either party may also notify the Court, by the deadline set forth herein, as to any motion that was pending prior to the entry of this Order that the party wishes to have the Court resume considering." (Id.)

---

[14] Defendants acknowledged that Plaintiff had arguably stated a section 1983 claim against Freeman and Hopkins. (Doc. no. 13 at 2.)

On the October 28, 2011 deadline, the parties filed a Rule 26(f) report setting forth proposed scheduling deadlines. (Doc. no. 30.) On November 14, 2011, the Court construed that filing as a motion to reopen the case, granted the motion, and amended the Court's previous scheduling Order. (Doc. no. 31.) The motion to reopen did not notify the Court that Plaintiff wished the Court to rule on her motion for reconsideration or motion to amend; nor did any other filing notify the Court of the need to take up those motions.[15]

On May 15, 2012, Freeman and Hopkins moved for summary judgment. (Doc. no. 36.) The parties have filed numerous briefs and copious evidence in support of, and in opposition to, the motion for summary judgment. (See Doc. nos. 37-62.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of

---

[15] Throughout Plaintiff's briefing on Freeman and Hopkins's motion for summary judgment, Plaintiff presents various arguments regarding the liability of Defendants Grovetown and Robinson. (See Doc. no. 54 at 23-25; Doc. no. 54, Ex. 1 at 6, 10, 15; Doc. no. 61 at 9-15.) However, the Court's December 20, 2010 Order dismissed all the claims against Grovetown and Robinson, and Plaintiff did not comply with the Court's May 3, 2011 Order establishing a schedule to revive the terminated motion for reconsideration and motion to amend. These motions remain terminated, and the previously dismissed claims remain dismissed. To resurrect these claims on summary judgment would excuse Plaintiff's noncompliance without a showing of good cause and deprive Defendants of notice and a fair opportunity to address the merits of these claims at summary judgment.

the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor."  U.S. v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial.  Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).  Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  Jones v.

11

City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam).   A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient.   Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment."   Id.   When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden.   If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated."   Fitzpatrick, 2 F.3d at 1116.   If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."   Id. at 1117.   The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of the Court gave Plaintiff notice of the motion for summary judgment and informed her of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. no. 44.)   Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.   The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

### III. DISCUSSION

As one district court aptly stated, cases involving an unfortunate event like a jail suicide "are difficult for all parties involved.   They are difficult as well for a judge or juror, who must resolve disputed issues on the basis of the law and not on feelings of sympathy either for plaintiffs, who have suffered greatly, or for defendants, who have a difficult and often thankless job." Mombourquette v. Amundson, 469 F. Supp. 2d 624, 626 (W.D. Wis. 2007).   With that in mind, the Court turns to the substantive law governing this case.

**A. Deliberate Indifference Standard**

Plaintiff claims that Freeman and Hopkins were deliberately indifferent to a strong likelihood that Love would commit suicide in violation of 42 U.S.C. § 1983.   Section 1983 claims are predicated on an alleged violation of an underlying constitutional right.   In the case of a pretrial detainee like

13

Love, "the Eighth Amendment prohibitions against cruel and unusual punishment do not apply." Cook v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1115 (11th Cir. 2005). Nevertheless, "[t]he Due Process Clause of the Fourteenth Amendment guarantees pretrial detainees the right to basic necessities that the Eighth Amendment guarantees convicted persons." Gish v. Thomas, 516 F.3d 952, 954 (11th Cir. 2008). "Pretrial detainees and other prisoners have the right to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide." Id. (quotation omitted).

"To establish liability for a prisoner's suicide under section 1983, 'the plaintiff must show that the jail official displayed *deliberate indifference* to the prisoner's taking of his own life.'" Id. (quoting Cook, 402 F.3d at 1115) (emphasis added). While deliberate indifference "entails something more than mere negligence," the standard is satisfied by "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). Instead, "acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." Id. at 836. Thus, the plaintiff must prove that the jail official (1) "had subjective knowledge of a risk of

14

serious harm" and (2) "disregarded that risk by conduct that constituted more than mere negligence." Gish, 516 F.3d at 954; see also Farmer, 511 U.S. at 837 ("[A] prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

"[S]ince a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk, a genuine issue of material fact exists *only if the record contains evidence, albeit circumstantial, of such subjective awareness.*" Campbell v. Sikes, 169 F.3d 1353, 1364 (11th Cir. 1999) (quotations and citations omitted) (emphasis in original). As stated by the *Supreme Court*:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

Farmer, 511 U.S. at 842 (internal citations omitted); see also id. at 852 (Blackmun, J., concurring) ("Under the Court's decision today, prison officials may be held liable for failure to remedy a risk so obvious and substantial that the officials must have known about it . . . .").[16]   Thus, "[w]hile the

---

[16] "That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so. Prison officials charged with

15

defendant's mere denial of subjective awareness is not dispositive, the plaintiff must provide sufficient circumstantial evidence, including the obviousness of the facts and of the resulting inference of risk, to support a finding of subjective awareness." Holland v. City of Atmore, 168 F. Supp. 2d 1303, 1310 (S.D. Ala. 2001), aff'd, 37 Fed. Appx. 505 (11th Cir. 2002).

In the context of a jail suicide, the question is whether a defendant was deliberately indifferent to the detainee's suicidal tendencies. Tittle v. Jefferson Cnty. Comm'n, 10 F.3d 1535, 1539 (11th Cir. 1994). "Absent knowledge of a detainee's suicidal tendencies, . . . [the] failure to prevent suicide has never been held to constitute deliberate indifference." Cagle v. Sutherland, 334 F.3d 980, 989 (11th Cir. 2003) (quotation omitted). For a jail official to be deliberately indifferent to a detainee's taking of his own life, he must have had "knowledge of 'a *strong likelihood* rather than a mere possibility that the self-infliction of harm will occur.'" Cook, 402 F.3d at 1116

---

deliberate indifference might show . . . that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Farmer, 511 U.S. at 844. "So, while obviousness of the risk is not the ultimate inquiry, it may serve as circumstantial evidence that the officials actually knew of the risk." Coleman v. Parkman, 349 F.3d 534, 538 (8th Cir. 2003). "In other words, a district court should never ask a jury whether a risk was obvious or whether the official should have known. The court must ask whether the official knew. But a plaintiff need not secure officials' admissions to support a verdict. Rather, a plaintiff can support an 'actually knew' answer with sufficient 'must have known' evidence." Id. at 538 n.3 (citing Farmer, 511 U.S. at 843 & n.8).

(quoting Cagle, 334 F.3d at 986 (emphasis in original)).  "[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners." Gish, 516 F.3d at 954.

The only circumstances recognized as providing a sufficiently strong likelihood of jail suicide are prior attempts or threats to commit suicide. Holland, 168 F. Supp. 2d at 1311; see also Cook, 402 F.3d at 1116 ("[T]he law of this circuit makes clear that [jail officials] cannot be liable under § 1983 for the suicide of a prisoner who never had threatened or attempted suicide and who had never been considered a suicide risk."). "The flip side of this proposition, of course, is that '[w]here prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their failure to take steps to protect that inmate from committing suicide can amount to deliberate indifference.'" Holland, 168 F. Supp. 2d at 1312 (quoting Greason v. Kemp, 891 F.2d 829, 835 (11th Cir. 1990)).

This does not mean that all prior threats and attempts establish a strong likelihood of suicide. Id. at 1312-13.  On the contrary, a strong likelihood cannot be shown if the prior threat or attempt was temporally remote. See id. at 1313 (surveying caselaw); see also, e.g., Fowler v. Chattooga Cnty., Ga., 307 Fed. Appx. 363, 364-65 (11th Cir. 2009) (finding that two month old incident – where jail officials observed inmate

17

with a sheet and concluded he was a threat to hang himself – was temporally remote, especially where medical professionals had since evaluated the inmate and found no suicidal ideation); Mombourquette, 469 F. Supp. 2d at 638 (stating that knowledge of two prior suicide attempts within past ten days was sufficient to create a jury question); Greffey v. Ala. Dep't of Corr., 996 F. Supp. 1368, 1383 (N.D. Ala. 1998) (finding that suicide attempt in past two months was not temporally remote).

The prior threat or attempt also must have appeared genuine and been free of indicia of manipulation or pretense. Greffey, 996 F. Supp. at 1383. Thus, a history of fake suicide threats or attempts may undermine a showing of deliberate indifference. Id. (citing Cartwright v. City of Concord, 618 F. Supp. 722 (N.D. Cal. 1985); see also, e.g., Fowler, 307 Fed. Appx. at 366 (jail official knew that inmate had used idle threats of suicide to get his way in the past). Additionally, the jail official must have been "aware that the *combination* of the prisoner's suicidal tendencies and the feasibility of suicide in the context of the prisoner's surroundings creates a strong likelihood that the prisoner will commit suicide." Gish, 516 F.3d at 954-55 (although officer knew that detainee was suicidal, officer did not know that police car's security screen was unlocked and thus did not know that detainee would have access to loaded gun).

Finally, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844; see also Cagle, 334 F.3d at 989 ("Because we presume that Jailer Cole was aware of Butler's suicide threats, we must look to see whether Jailer Cole's acts were deliberately indifferent to this risk."). "When determining the adequacy of an official's response to a known risk of inmate safety, deliberate indifference . . . requires proof of a reckless disregard of the known risk." Coleman, 349 F.3d at 538-39.

While the adequacy of preventative measures necessarily depends on the particular circumstances of the case, the Eleventh Circuit has generally found that jail officials who know of an inmate's suicidal tendencies cannot be considered deliberately indifferent if they remove "all implements that could foreseeably be used by [the detainee] to commit suicide," or observe the detainee at more frequent intervals. See Gish, 516 F.3d at 955 (citing Cagle, 334 F.3d at 984). The Eleventh Circuit, however, has "rejected any argument that failing to guard an inmate continuously constitutes deliberate indifference." Belcher v. City of Foley, Ala., 30 F.3d 1390, 1400 (11th Cir. 1994). A few cases are illustrative of these principles.

19

For example, in Cagle, a jail official was aware of a detainee's recent suicide threats.   334 F.3d at 984 n.4. However, the jailer was not deliberately indifferent because he observed the detainee every fifteen minutes via closed circuit television, and the detainee's "cell had been stripped of implements that might assist suicide," such as the detainee's sheets, belt, shoelaces, and pocket contents. Id. at 984, 989-90.  The jailer "was not required to foresee that [the detainee] would hang himself with the elastic from his underwear," a rather "unusual" instrument of suicide. Id. at 989 & n.13.

In Belcher, jail officials observed a detainee tying his shirt to a light fixture and to his neck.   30 F.3d at 1393. They moved him to a bare cell, took away his shirt, checked on him every five minutes, and initiated steps to move him to a jail equipped to deal with suicidal inmates.   Id. at 1393-94. These preventative measures evidenced a lack of deliberate indifference, and the jail officials were entitled to qualified immunity. See id. at 1401.

In contrast, in Snow v. City of Citronelle, 420 F.3d 1262, 1267, 1270 (11th Cir. 2005), the Eleventh Circuit held a jury could reasonably find that a jail official deliberately failed to prevent a suicide where he: (1) did not tell other jail officials of the suicide risk, (2) did not increase observation of the detainee, (3) did not remove items from the cell that could be used to harm oneself, and (4) did not place the

20

detainee in a drunk tank or return her to a hospital for treatment and observation.

Similarly, in Mombourquette, the district court determined that a reasonable jury could find deliberate indifference where a nurse who knew of a detainee's recent suicide attempts did not place the detainee on suicide watch or order more frequent cell checks. 469 F. Supp. 2d at 645-46. The nurse "did not take away from [the detainee] any objects she could use to hurt herself, including bed sheets, the very materials with which [the detainee] had hung herself only a few days earlier." Id. at 646. The fact that the nurse took some minor actions - eliciting a promise from the detainee to refrain from harming herself and noting in the jail log that the detainee should be observed closely - did not preclude liability. See id. ("The Constitution does not hold officials liable only when they do nothing." (emphasis in original)). Likewise, the jail officials in Mombourquette were also denied summary judgment because they knew of the prior suicide attempts and did not place the detainee on suicide watch, put her in an observation cell, take away the sheets, or seek further direction from supervisors or medical professionals. Id. at 647-49.

With these legal principles in mind, the Court now addresses whether Freeman and Hopkins had subjective awareness of and recklessly disregarded the risk of Love's suicide.

## B. Application

### 1. Subjective Awareness of the Suicide Risk

Whether a prison official had the requisite subjective awareness of the suicide risk is a question of fact for the jury. Farmer, 511 U.S. at 842. Freeman and Hopkins rely heavily upon their own assertions that they had no subjective knowledge of the risk. While a jury may believe their testimony, courts cannot resolve credibility issues at the summary judgment phase. Coleman, 349 F.3d at 539. Their denial of subjective awareness is therefore not dispositive, as long as there is sufficient circumstantial evidence, including the obviousness of the facts, to support a finding of subjective awareness of a strong likelihood of suicide. See Farmer, 511 U.S. at 842; Holland, 168 F. Supp. 2d at 1310. The Court has focused on this circumstantial evidence.[17]

---

[17] Both Plaintiff and Defendants have presented expert opinions. (See Doc. nos. 35, 48, 52.) However, the Court has not found these expert opinions to be particularly helpful or relevant to the task at hand. In assessing the obviousness of suicide risk to jailers, courts of appeal, including the Eleventh Circuit, have rejected reliance on expert testimony. See Mombourquette, 469 F. Supp. 2d at 644 (citing Matos v. O'Sullivan, 335 F.3d 553, 557-58 (7th Cir. 2003); Cook, 402 F.3d at 1111 (affirming exclusion of jail suicide expert because opinions were not beyond the understanding of the average lay person and therefore unnecessary); Edwards v. Gilbert, 867 F.2d 1271, 1275-76 (11th Cir. 1989) (finding that opinion of jail suicide expert did not factor into deliberate difference inquiry).

Additionally, while Freeman and Hopkins's conduct may have violated GDPS standard operating procedures or fallen below industry standards, these criteria do not supplant the constitutional inquiry. See Belcher, 30 F.3d at 1399 (stating that national jail standards did not affect the deliberate indifference inquiry); Edwards, 867 F.2d at 1276-77 (citing numerous cases for proposition that state laws and regulations, as well as internal department procedures, do not broaden jail officials' constitutional duties).

The circumstances of Love's April 28, 2008 intake – viewed in isolation – are not sufficient to show the requisite "strong likelihood" of suicide.  While Love was intoxicated, strung out, upset, and extremely agitated, these behavioral indicators are not abnormal among detainees and do not indicate a strong likelihood of suicide.  See Holland, 168 F. Supp. 2d at 1310 ("Courts, including the Eleventh Circuit, have rejected the notion that circumstances such as intoxication, sadness, anger, concern or violence reflect a strong likelihood of imminent suicide.").  Likewise, the fact that Love was taking medication for a psychiatric disorder, by itself, could not have alerted Freeman and Hopkins to a strong likelihood of suicide.

When Love said: "I don't want to be here anymore" and mumbled something about a "pine box," these comments provided some notice that Love was a suicide risk.  The comments alone, in the jail setting, appear rather innocuous.  However, Love made these comments in direct response to Hopkins's question of whether Love had any suicidal thoughts or intentions.  (See Doc. no. 42 at 36.)  The context is crucial.  The comments may not have been a clear suicide threat, but they did suggest some suicidal ideation by Love.  Moreover, the fact that Hopkins initially checked "Yes" next to the ninth question on the intake form shows that Hopkins initially appreciated Love's risk of suicide.

When Freeman and Hopkins followed up, Love essentially denied being suicidal, and Hopkins changed the answer from "Yes" to "No."[18]  Generally, an inmate's denial of suicidal ideation is not dispositive of the subjective awareness inquiry.  See Mombourquette, 469 F. Supp. 2d at 644 ("In cases in which the inmate had already demonstrated a tendency to harm herself, courts have held uniformly that a genuine dispute remains whether the defendants were aware of substantial risk of serious harm, even when the inmate denies feelings of suicide.").  And as Freeman acknowledged, jailers cannot necessarily trust what an inmate says.  (See Freeman Dep. at 42.)  Also, the fact that Freeman specifically told Meek to check on Love at night because Love was extremely agitated and "could do anything back there" suggests that Freeman was aware that Love presented at least some risk of suicide.  Nevertheless, the Court concludes that Love's comments and the other circumstances of Love's intake were not sufficiently obvious to show that Freeman and Hopkins

---

[18]  In two prison suicide cases, courts have found that unexplained alterations of jail records raised factual questions precluding summary judgment.  See Linden v. Washtenaw Cnty., 167 Fed. Appx. 410, 427 (6th Cir. 2006) (reversing summary judgment because, inter alia, unaccounted for change of jail official's incident report "smack[ed] of a cover up" and was an unanswered factual question); Guglielmoni v. Alexander, 583 F. Supp. 821, 828 (D. Conn. 1984) (denying summary judgment where two entries in the jail log, at times just before the suicide, were scratched out).

Unlike Linden and Guglielmoni, the change made to Love's intake form was explained by Freeman and Hopkins in a fairly consistent manner.  To conclude that Freeman and Hopkins altered the records after Love's suicide (as Plaintiff suggests, see Doc. no. 54, Ex. 1 at 20) would be entirely speculative.  There is, however, one aspect of the change that has not been sufficiently explained.  Neither Freeman nor Hopkins discussed why the check mark next to "No" on the ninth question has been scribbled out.  (See Doc. no. 42 at 14.)  This factual issue could, and probably should, be explored further at trial.

were initially aware of a strong likelihood of suicide. At most, these circumstances show awareness of a mere possibility of suicide.

On the next morning, however, the circumstances changed quite dramatically when Hopkins saw that Love had tied a sheet to the shower door support bar and relayed this information to Freeman. The shower door support bar was located at the height of six feet and ten inches, which was clearly sufficient for Love to attempt suicide. The fact that the sheet was tied down strengthens the likelihood of suicide. In the jail setting and at that specific location, a tied-down sheet is an obvious instrument of suicide.

Looking at this event in the light most favorable to Plaintiff, a jury could reasonably conclude that Love was preparing to commit suicide. In other words, he had initiated a suicide attempt, albeit one that was temporarily aborted when Hopkins returned to the cell. And considering what Freeman and Hopkins previously observed during Love's intake, a fair-minded jury could further conclude that this suicide attempt was sufficiently obvious that Freeman and Hopkins must have been aware that Love was a serious suicide risk. See Holland, 168 F. Supp. 2d at 1312 ("[W]here prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their failure to take steps to protect that inmate from committing suicide can amount to deliberate

25

indifference.'" (quoting <u>Greason</u>, 891 F.2d at 835)).[19]   While some facts support a contrary finding, the Court cannot determine that Freeman and Hopkins were unaware of the suicide risk as a matter of law.[20]

Importantly, there is no other explanation as to why Love tied the sheet to the shower door bar that is sufficient to disprove Freeman and Hopkins's subjective awareness of the suicide risk as a matter of law.   Hopkins explained that "the sheet was hanging perfectly down like he wanted his own makeshift shower curtain."   (Hopkins Dep. at 44-45.)   This explanation makes little sense because, at the time of the incident, the shower stall was already equipped with a wooden door, which established privacy for a showering inmate and would have made a makeshift curtain entirely unnecessary.   (<u>See</u> Doc. no. 39 at 3, 5; Doc. no. 42 at 25, 29.)   Further, Hopkins's

---

[19] Unlike in other cases, there is no issue of temporal remoteness here. Hopkins observed Love tying the sheet to the shower door support bar just hours before Love's actual suicide.   Nor are there any facts suggesting that Love's aborted suicide attempt was not genuine.   Love had no history of feigned suicidal behaviors.

[20] Two facts do support Freeman and Hopkins's argument that they were not subjectively aware of a high risk of suicide.   First, Freeman was unaware of any suicidal behaviors by Love during his prior stints at the GDPS jail. Second, Love had removed the sheet from the shower door support bar when Hopkins returned to the cell less than a minute after he observed the incident.   While relevant, these facts can hardly be dispositive of the subjective inquiry because (1) there is sufficient evidence that Freeman and Hopkins were already aware of some possibility of Love's suicide based on what they observed at the intake on the previous day, and (2) Love's tie-down of the sheet can be viewed as obvious preparation for suicide, especially because Freeman and Hopkins do not advance any other credible explanation of the incident, as discussed <u>infra</u>.

Of course, it remains open to Freeman and Hopkins "to prove that they were unaware even of an obvious risk to inmate health or safety" at trial. <u>Farmer</u>, 511 U.S. at 844.   "That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so."   <u>Id.</u>

deposition testimony that the sheet was merely "hanging" and "didn't appear to be tied" is flatly contradicted by his earlier statement to the GBI investigator, in which he related that he "observed that Love had *tied* a bed sheet around the shower door support bar." (Compare Hopkins Dep. at 44-45 with Doc. no. 42 at 41 (emphasis added).)   Unlike Hopkins, Freeman does not advance the "makeshift shower curtain" explanation for Love's sheet-tying incident.   Indeed, when Freeman was asked what he thought qualified as a suicide attempt, he candidly stated, "if somebody walked in and at the time that he was tying the curtain -- or the sheet -- around the rod, to me, that's an attempt right there."  (Freeman Dep. at 71.)

Instead of advancing Hopkins's explanation, Freeman essentially contends that he was not aware of all the underlying facts that made Love's suicide risk obvious.   Specifically, Freeman asserts that he was not aware that Love had tied the sheet *to the shower door support bar.*   At his deposition, he recalled that Hopkins told him that Love was "making a tent," which he took to mean that Love had merely "tucked" the sheet under the mattress on the upper bunk for privacy. (See Freeman Dep. at 29-31, 38.)   "Making a tent" would not have been out of the ordinary.  (Id. at 31-32.)

However, Freeman's recollection of this event is highly questionable in light of other facts.   First, according to Freeman's own GBI statement, Hopkins notified him that Love "was

*tying* a bed sheet to 'the bar.'"    (See Doc. no. 42 at 36 (emphasis added)).    Freeman later testified that "if [Hopkins] would have said tying something to a bar, that would have been something that was out of the ordinary."  (Freeman Dep. at 32, 72.)    Although Freeman's GBI statement relates that he thought Hopkins was referring to the bar on Love's bunk bed, there is sufficient evidence on the record from which a jury could find that Freeman was told the bed sheet was tied to the shower door support bar.    Specifically, Hopkins's GBI interview shows: "Hopkins related that at one time in the morning, prior to lunch, he observed that Love had tied a bed sheet *around the shower door support bar.*  [Hopkins] advised that *he informed Sergeant Freeman about this* and was told to have Love remove the sheet."  (Doc. no. 42 at 41 (emphasis added).)    Additionally, Freeman acknowledged that he was aware that inmates could commit suicide by tying a sheet to either the shower door support bar *or the bunk beds*.  (See Freeman Dep. at 37-38, 72.)

    Given that there are inconsistencies in Freeman and Hopkins's accounts of the sheet-tying incident as found in their respective depositions and GBI interviews, there are numerous and significant factual questions and credibility determinations that should be addressed by a jury.  Viewing the facts in the light most favorable to Plaintiff, a jury could find that both Freeman and Hopkins knew that Love had tied a sheet to the shower door support bar.  As described supra, a jury could

reasonably infer that Freeman and Hopkins were already aware of a possibility that Love was suicidal because of what transpired at Love's intake.   Operating under this view, a jury could reasonably conclude that Freeman and Hopkins knew that Love's sheet-tying incident was a suicide attempt in progress.   Thus, assessing the totality of the circumstances, a fair-minded jury could ultimately conclude that Freeman and Hopkins were subjectively aware of a strong likelihood of suicide.   See Mombourquette, 469 F. Supp. 2d at 638 ("In all of the published appellate cases I have reviewed, the court found that, when the defendants were aware of recent suicide attempts, it would be improper to grant summary judgment or judgment as a matter of law on the question whether defendants were aware of a substantial risk of serious harm.").

Further, as the Supreme Court explained in Farmer, a jail official may "not escape liability if the evidence show[s] that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." 511 U.S. at 843 n.8. "In other words, the Constitution does not reward those who play ostrich." Mombourquette, 469 F. Supp. 2d at 645 (citing Farmer, 511 U.S. at 843 n.8; McGill v. Duckworth, 944 F.2d 344, 351 (7th Cir. 1991)). Looking at the totality of the circumstances known to Freeman and Hopkins, a jury could reasonably infer that Freeman and Hopkins refused to verify underlying facts or

confirm inferences regarding Love's suicide risk that they strongly suspected to be true.

### 2. Reckless Disregard of the Suicide Risk

Assuming that Freeman and Hopkins were subjectively aware of a substantial risk of Love's suicide, a jury could reasonably find that their response was sufficiently indifferent as to constitute reckless disregard of the risk. See Coleman, 349 F.3d at 538-39.

After Love was observed tying a sheet to the shower door bar, Freeman told Hopkins to tell Love to take down the sheet. The fact that Hopkins returned to the cell with the intention of ordering Love to untie and remove the sheet from the shower door bar is not sufficient in itself to absolve Freeman and Hopkins from liability, since Love would have been able to simply wait until Hopkins left to resume his suicide attempt. "The Constitution does not hold officials liable only when they do *nothing*." Mombourquette, 469 F. Supp. 2d at 646 (emphasis in original) (citing Cavalieri v. Shepard, 321 F.3d 616, 622 (7th Cir. 2003)).

Moreover, when Hopkins returned to the cell and found that Love had already taken down the sheet, no further action was taken. Freeman and Hopkins did not place Love on suicide watch; did not contact medical or mental health professionals; did not take away Love's sheet and other potential instruments of suicide; did not place Love in an isolated cell; did not

increase their observation of Love; did not question Love as to why he had tied the sheet down on the shower door support bar; and did not even record the incident in the jail log. Essentially, they did nothing, and, within a couple hours, Love hanged himself with the sheet.

Freeman and Hopkins were not required to take all of the above-listed actions to avoid liability. However, they were required to take at least some preventative steps to minimize the risk of Love's suicide. Cf. Snow, 420 F.3d at 1270 (reversing grant of summary judgment where jail official may have known of strong suicide risk and did not increase observation of detainee, remove items from the cell that could be used to harm oneself, isolate the detainee, or return her to a hospital); Cagle, 334 F.3d at 984, 989-90 (jail official was not deliberately indifferent because he observed the detainee every fifteen minutes via closed circuit television, and the detainee's "cell had been stripped of implements that might assist suicide," such as the detainee's sheets, belt, shoelaces, and pocket contents); Belcher, 30 F.3d at 1393-94, 1401 (jailer was not deliberately indifference because he moved detainee to a bare cell and checked on him every five minutes, inter alia); Fowler, 307 Fed. Appx. at 364-65 (after observing prisoner trying to attach a sheet to a stairwell and concluding that he was a threat to hang himself, jailers placed prisoner in administrative segregation where he was checked more

31

frequently)[21]; <u>Mombourquette</u>, 469 F. Supp. 2d at 646-47 ("Given
[jailer]'s failure to take away dangerous objects from plaintiff
in combination with her failure to take many other measures, I
cannot conclude that summary judgment is appropriate.").

Given that Love was seen preparing to commit suicide using
a bed sheet, perhaps the most *significant* inaction was Freeman
and Hopkins's failure to take away Love's access to the sheets.
As the district court in <u>Mombourquette</u> found "most relevant,"
the jail official "did not take away from plaintiff any objects
she could use to hurt herself, including bed sheets. . . . It
does not take an expert in mental health to realize that a
person should not be left alone for any period of time with
materials with which she had tried to kill herself only a few
days earlier."[22]   469 F. Supp. 2d at 646.

In summary, a jury could reasonably find that Freeman and
Hopkins had subjective knowledge of a strong likelihood that
Love would commit suicide and that they recklessly disregarded
the risk.   To find that they were not deliberately indifferent
to the risk of self-harm, the Court would have to resolve
factual disputes, make credibility determinations, and draw

---

[21] For a more extensive version of the facts, <u>see</u> <u>Fowler v. Chattooga
Cnty., Ga.</u>, No. 4:07-cv-145, at *14 (N.D. Ga. Apr. 25, 2008).

[22] The <u>Mombourquette</u> court also found that removal of items that can be
used to facilitate suicide – and specifically the removal of sheets – is a
common jail practice, which has been noted in numerous court decisions. <u>See</u>
469 F. Supp. 2d at 646; <u>see</u>, <u>e.g.</u>, <u>Coleman</u>, 349 F.3d at 539 (holding that
jury could reasonably deduce that appellants recklessly disregarded a known
suicide risk when they issued detainee a bed sheet and placed him in a cell
where they could not easily observe him).

inferences adverse to Plaintiff – all of which are prohibited at this stage.    While a jury may ultimately find Freeman and Hopkins's arguments to be persuasive, Plaintiff's section 1983 claim is genuinely disputed and must proceed to trial.

## C. Miscellaneous Issues

### 1. Qualified Immunity

Freeman and Hopkins's motion for summary judgment and supporting briefs do not mention – let alone address – the issue of qualified immunity.[23]  (See Doc. nos. 36, 58, 62.)  Due to the failure to present the issue here, the Court will not analyze qualified immunity in resolving the motion for summary judgment. The fact that the defense was raised in the Answer (doc. no. 11) is irrelevant.  See Holder v. Nicholson, 287 Fed. Appx. 784, 790 (11th Cir. 2008) (parties may not bury issues in the pleadings and resurrect them after summary judgment); Barker v. Goodrich, 649 F.3d 428, 432 (6th Cir. 2011) (although sovereign immunity defense was raised in answer, defendant's failure to assert the defense in motion for summary judgment waived the issue); Fehlhaber v. Fehlhaber, 702 F.2d 81, 84 (5th Cir. 1983) (although issue was raised in answer, it was deemed abandoned by failure to raise it in summary judgment briefs).  Without more, it is also irrelevant that Freeman and Hopkins have cited cases addressing qualified immunity.  See U.S. v. Kafleur, 168 Fed.

---

[23] Qualified immunity is of course "conceptually distinct" from the merits of Plaintiff's deliberate indifference claim.  Cook v. Martin, 148 Fed. Appx. 327, 335 (6th Cir. 2005).

Appx. 322, 327 (11th Cir. 2006) (while defendant cited several cases referencing an issue, it did not "clearly present" the issue, and the district court and the opposing party were not obligated to address the issue).   In short, the Court will not raise a defense that Freeman and Hopkins themselves declined to raise.

### 2. State Law Claims

For similar reasons, Plaintiff's state law claims against Freeman and Hopkins must proceed to trial.   Count Five of Plaintiff's Complaint asserts claims against Freeman and Hopkins predicated upon violations of a Georgia statute and the Georgia Constitution.   (See Compl. ¶¶ 169-92.)   Freeman and Hopkins acknowledged the pending state law claims in the motion for partial judgment on the pleadings and reserved their arguments "for another day."   (Doc. no. 13 at 2.)   However, Freeman and Hopkins's motion for summary judgment and supporting briefs only address the merits of Plaintiff's section 1983 claim.   They do not address the pending state law claims *at all*.   (See Doc. nos. 36, 58, 62.)   Currently uncontested, the state law claims shall proceed to trial.

### 3. Violation of Local Rules

Defendants contend that Plaintiff has violated the Court's Local Rules.   First, Defendants object to arguments set forth in Plaintiff's response to Defendants' statement of facts on the ground that Plaintiff has violated the page number limitations

established by Local Rule 7.1(a).   (Doc. no. 58 at 1 n.1.)
Second, Defendants object that Plaintiff does not cite to legal
authorities or the factual record in violation of Local Rule
7.1(b).   (Id. at 4 n.2; Doc. no. 62 at 1.)

"Absent prior permission of the Court, no brief shall
exceed twenty-six (26) pages in length, inclusive of the
certificate of service required by LR 5.1." S.D. Ga. Local Rule
7.1(a).  Plaintiff's response to Defendants' statement of facts
exceeds this page limitation.   (See Doc. no. 54-1.)   And as
Defendants point out, Plaintiff utilizes this document not only
to respond to Defendants' statement of facts, but to respond to
Defendants' motion for summary judgment brief.   Given that
Plaintiff's brief in response to Defendants' motion for summary
judgment is itself twenty-six pages (see doc. no. 54),
Plaintiff's inclusion of extensive legal arguments in the
response to the statement of facts is an inappropriate end-run
around the page limitations applicable to the summary judgment
briefing.  Cf. Pandora Jewelers 1995, Inc. v. Pandora Jewelry,
LLC, No. 09-61490-CIV, 2011 WL 1807676, at *4 (S.D. Fla. May 12,
2011) (holding that inclusion of legal arguments in exhibits
improperly circumvented the page limitation for a summary
judgment reply brief).

Plaintiff's response to the statement of facts is saturated
with legal arguments.  This is itself inappropriate under Local
Rule 56.1, which allows a "separate, short, and concise"

statement of material facts and response thereto.  See S.D. Ga. Local Rule 56.1.   This Local Rule allows "conclusions of law" but certainly does not permit extensive legal argument which is ordinarily reserved for summary judgment briefs.   See Reno v. City of Chicago, No. 10-cv-6114, 2012 WL 2368409, at *1 (N.D. Ill. June 21, 2012) (discussing analogous rule and stating that the "purpose of Local Rule 56.1 statements is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments").

The Court further observes that Plaintiff's counsel, Mr. Batson, has similarly violated these Local Rules in other cases. See, e.g., D'Antignac v. Deere & Co., No. 1:10-cv-116, Doc. no. 64 (S.D. Ga. May 4, 2012); Harris v. FPL Food, LLC, No. 1:09-cv-166, Doc. no. 75 (S.D. Ga. Feb. 7, 2011); Hegre v. Sally Beauty Holdings, Inc., No. 1:07-cv-161, Doc. no. 28 (S.D. Ga. June 30, 2008).   Mr. Batson's responses to statements of fact, all inappropriately inundated with legal argument, have consistently frustrated this Court and wasted its resources.

Local Rule 7.1(b) requires motions, responses, and briefs to support every factual assertion with a citation to the factual record.   It also requires citation to supporting legal authorities.   See S.D. Ga. L.R. 7.1(b).   The Court agrees with Defendants that Plaintiff has failed to support all factual assertions with citations to the record.   (See, e.g., Doc. no. 54 at 7, 11-12, 15-16.)

Defendants' objections are sustained, and the Court will only consider Plaintiff's filings to the extent that they comply with the Court's Local Rules.[24]   See <u>Bagwell v. Peachtree Doors & Windows, Inc.</u>, No. 2:08-cv-191, 2011 WL 1497831, at *5 (N.D. Ga. Feb. 8, 2011) (denying motion to strike but "disregard[ing] any statements of material fact or responses thereto that do not comply with the requirements of LR 56.1"). Further, the Court hereby notifies and warns Mr. Batson that further violations of these Local Rules in other cases may lead to sanctions against him personally, as well as striking his noncompliant filings.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (doc. no. 36) is **DENIED**. Plaintiff's motion for leave to file a sur-reply brief (doc. no. 59) is **DENIED AS MOOT**. This case will proceed to trial.

**ORDER ENTERED** at Augusta, Georgia, this $\underline{\quad}$ day of July, 2013.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[24] Disregarding these materials has not changed the Court's disposition of the motion for summary judgment.